STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ISAAC THOMAS, DEFENDANT-APPELLANT.

Argued March 1, 1988—Decided June 30, 1988.

674

*Marcia Blum,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Leslie F. Schwartz*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

The question presented in this case is whether a police officer was justified in conducting a protective search for weapons on a suspect who was the target of an investigatory stop. Defendant, Isaac Thomas, pled guilty to possession of a controlled dangerous substance after the trial court denied his motion to suppress evidence discovered during the search. The Appellate Division affirmed the conviction, upholding the denial of the motion. We granted certification, 108 *N.J.* 658 (1987), and we now reverse.

I

Both defendant and the investigating officer testified at the suppression hearing. The trial court accepted the credibility of the officer. We find no basis to disturb that ruling and therefore accept as true the officer's account of the relevant facts.

On May 3, 1985, at about midnight, Detective–Sergeant Williams of the Passaic Detective Bureau received a message from a police dispatcher that an anonymous informant had telephoned the police. The caller said that a man named Ike, dressed in a plaid cap, tan jacket, and wearing gold frame glasses, was in possession of illegal drugs inside the Shangri La Bar at 265 Passaic Street.

Williams and two other officers proceeded to the Shangri La Bar. The officers entered the bar, and Williams observed that the defendant, one of approximately twenty-five people in the bar, fit the informant's description. The officer also recognized defendant from a prior arrest for drug possession. Williams testified that on confronting the defendant, he immediately

"asked him to stand away from the bar and I proceeded to frisk him * * * for any possible weapons or anything that may be in his possession at that time." Further, Williams recalled that "I feeled [*sic*] what he had was inside his jacket pocket, was something that appeared to be sharp inside of the pocket." The following colloquy occurred during Williams' cross-examination:

Q. Okay. So you went into his pocket and the first item that you felt when you went in his pocket was a straw, or the thing that alerted you that it might be a possible weapon was a straw, is that correct?

A. Sort of a weapon or a potential weapon. You have to be careful with cocaine dealers because they carry razor blades with them, not to harm anyone, but to cut the cocaine up prior to injecting it, so you have to be very—when you're putting your hand inside somebody's pocket, you have to be careful because you might end up losing your finger, inadvertently losing your finger, so it's a situation like that. I felt something sharp there so I went there to extract it because I didn't know if it potentially could be used as a weapon.

When the detective reached into the pocket, he took hold of several objects. He pulled out a two-inch straw (later identified as the sharp object), a pack of rolling papers, a hand-rolled cigarette, a tinfoil packet containing cocaine, and a manila envelope containing marijuana. Thereafter, Williams placed defendant under arrest.

In denying defendant's motion to suppress the articles seized during the search, the trial court found that it was proper for the police to have responded to the anonymous tip and confront defendant in the bar. Further, the court held that the "combination of all the factors" described by Officer Williams provided a justifiable basis for the pat-down search of defendant. Finally, the court concluded that Detective Williams had not exceeded the permissible scope of such a search by emptying defendant's pocket, and thus the cocaine was discovered legitimately. Following denial of the suppression motion, defendant pled guilty to unlawful possession of a controlled dangerous substance.

The Appellate Division affirmed in an unpublished decision. The court agreed with the trial court that the anonymous tip justified the initial investigatory stop. The Appellate Division observed that when the information relayed by the tip was

"combined with the detective's knowledge of defendant's prior drug law violation, a sufficient degree of suspicion justified frisking the defendant for a razor." Further, "[t]he likelihood the defendant possessed the razor came from the detective's prior drug law enforcement experience." The court also held that the search "did not go beyond the scope of a protective purpose."

## II

In this case we have no occasion to consider the *subjective* factors that might prompt a law-enforcement official to search a suspect who is the subject of a lawful investigatory stop and is thought to pose a threat to the officer's safety. Rather, we apply the principles established by the United States Supreme Court in *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968), and its progeny to determine whether the record contains sufficient evidence of *objective* criteria to support the search of defendant, which in turn determines the admissibility of the evidence seized. *Cf. State v. Bruzzese*, 94 *N.J.* 210, 219 (1983) (constitutionality of search and seizure determined by "objectively reasonable" standard).

In *Terry* the Court addressed for the first time the issue of when and how law-enforcement personnel may stop and question a suspect, without his consent, in the absence of grounds for an arrest. The Court recognized that establishing the fourth-amendment parameters for such procedures required balancing significant governmental interests. On the one side is the interest in prohibiting unreasonable and unwarranted official intrusion on private citizens. On the other side, as the Court stated, "[w]e are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally

be used against him." 392 *U.S.* at 23, 88 *S.Ct.* at 1881, 20 *L.Ed.*2d at 907.

The Court announced what has become known as the *Terry* rule:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. [*Id.* at 30–31, 88 *S.Ct.* at 1884–85, 20 *L.Ed.* at 911.]

The first component of the *Terry* rule concerns the level of reasonable suspicion that must exist before an "investigatory stop" legitimately may be undertaken. This involves something less than the probable cause standard needed to support an arrest. A police officer must be able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion. *Id.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 906. More recently, in *United States v. Cortez*, 449 *U.S.* 411, 101 *S.Ct.* 690, 66 *L.Ed.*2d 621 (1981), the Court reiterated this requirement, stating that an investigatory stop must be justified by some objective manifestation that the suspect was or is involved in criminal activity. *Id.* at 417, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 628. The essence of this standard is "that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629; *accord State v. Davis*, 104 *N.J.* 490, 504 (1986) (adopting totality-of-circumstances standard announced in *Cortez*).

Under the *Terry* rule, whether there is good cause for an officer to make a protective search incident to an investigatory stop is a question separate from whether it was permissible to

stop the suspect in the first place. *Terry* established that to protect himself, an officer may perform a reasonable search for weapons

where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; *the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.*

       \*       \*       \*       \*       \*       \*       \*       \*

And in determining whether the officer acted reasonably in such circumstances, due weight must be given, *not to his inchoate and unparticularized suspicion or "hunch,"* but to the *specific reasonable inferences* which he is entitled to draw from the facts in light of his experience. [392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.* at 909 (citations omitted; emphasis supplied).]

The reasonableness of the search, therefore, is to be measured by an *objective* standard. More than an officer's generalized statements and subjective impressions are required. The officer must be able "to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 *U.S.* 40, 64, 88 *S.Ct.* 1889, 1903, 20 *L.Ed.*2d 917, 935 (1968).

In *Ybarra v. Illinois*, 444 *U.S.* 85, 100 *S.Ct.* 338, 62 *L.Ed.*2d 238 (1979), the Court invalidated a protective frisk because there was no evidence of an objectively reasonable belief that the suspect was armed and dangerous. *Id.* at 92–93, 100 *S.Ct.* at 343, 62 *L.Ed.*2d at 246. Justice Stewart characterized the *Terry* rule as creating

an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. \* \* \**Nothing in Terry can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons.* The "narrow scope" of the Terry exception does not permit a frisk for weapons on less than *reasonable belief or suspicion directed at the person to be frisked* \* \* \*. [444 *U.S.* at 93–94, 100 *S.Ct.* at 343, 62 *L.Ed.*2d at 247 (emphasis supplied).]

Various circumstances may give rise to an objectively reasonable suspicion that a suspect is armed and dangerous. In some

instances the right to conduct a protective search flows directly from the basis for the investigatory stop. In his concurring opinion in *Terry*, Justice Harlan stated that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." 392 *U.S.* at 33, 88 *S.Ct.* at 1886, 20 *L.Ed.* at 913. Courts regularly approve of protective searches based solely on the suspicion that the suspect was involved in a violent crime. *See People v. Shackelford,* 37 *Colo.App.* 317, 546 *P.*2d 964 (1976) (rape); *State v. Kea,* 61 Hawaii 566, 606 *P.*2d 1329 (1980) (assault with a deadly weapon); *State v. Gilchrist,* 299 *N.W.*2d 913 (Minn. 1981) (homicide); *Mays v. State,* 726 *S.W.*2d 937 (Tex.Cr.App. 1986), *cert.* denied, *Mays v. Texas,* —— *U.S.* ——, 108 *S.Ct.* 1059, 98 *L.Ed.*2d 1020 (1988) (burglary).

Further, courts are more likely to approve of "automatic" protective searches when officers, before they even approach the suspect, have a specific and objectively credible reason to believe the suspect is armed. *See Adams v. Williams,* 407 *U.S.* 143, 92 *S.Ct.* 1921, 32 *L.Ed.*2d 612 (1972) (upholding protective search based on informant's tip that suspect seated in car was carrying narcotics and had "a gun at his waist."); *State v. Collins,* 479 *A.*2d 344 (Me.1984) (upholding automatic search of suspect whom police knew had prior weapons conviction).

However, in situations where the suspect is not thought to be involved in violent criminal conduct and the officers have no prior indication that the suspect is armed, more is required to justify a protective search. *See United States v. Ward,* 682 *F.*2d 876 (10th Cir.1982) (suspicion of bookmaking offense alone not enough to justify search); *Whitten v. United States,* 396 *A.*2d 208 (D.C.App.1978) (suspicion of shoplifting not enough); *State v. Cobbs,* 103 *N.M.* 623, 711 *P.*2d 900 (Ct.App.1985) ("In order, however, to conduct a frisk of a person suspected of engaging in a nonviolent offense, such as possession of small amounts of marijuana, vagrancy, or possession of liquor, additional articulable facts of potential danger must be present, as well as the suspicion of criminal activity"); *see also* 3 W.

LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a) at 507 (1987) (collecting other cases).

In cases where there is an insufficient basis for a protective search at the threshold of an encounter between an officer and a suspect, events occurring subsequent to a permissible investigatory stop may give rise to an objectively justified suspicion that the suspect is armed. In *Pennsylvania v. Mimms*, 434 *U.S.* 106, 98 *S.Ct.* 330, 54 *L.Ed.*2d 331 (1977), police officers stopped an automobile to issue the driver a traffic summons. As the driver exited the vehicle to produce his owner's card and operator's license, one of the officers noticed a large bulge under the driver's jacket. The officer frisked the driver and found a revolver in his waistband. The Court held that the gun was properly received into evidence. The "stop" of the automobile was justified by the traffic violation. Then, once the driver was out of the car, "[t]he bulge in the jacket permitted the officer to conclude that [the driver] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'" *Id.* at 112, 98 *S.Ct.* at 334, 54 *L.Ed.*2d at 338. *See also Lightbourne v. State*, 438 *So.*2d 380, 388 (Fla.1983) (upholding protective search on basis of suspect's "furtive movements and nervous appearance"), *cert.* denied, 465 *U.S.* 1051, 104 *S.Ct.* 1330, 79 *L.Ed.*2d 725 (1984); *State v. Wanczyk*, 201 *N.J.Super.* 258 (App.Div.1985) (protective search justified after officers properly stopped car carrying arson suspect, who appeared nervous and exhibited bulge in shirt sleeve).

Several courts have dealt with the *Terry* rule in the context of drug-related crime. When reviewing protective searches in this setting, courts are influenced by the seriousness of the suspected drug offense in determining whether officers were reasonable in believing the suspect was armed and dangerous. *See United States v. Oates*, 560 *F.*2d 45, 62 (2d Cir.1977) (observing that "to *'substantial dealers* in narcotics' firearms are as much 'tools of the trade' as are most commonly recog-

nized articles of narcotics paraphernalia." (emphasis supplied)); *United States v. Santana,* 485 *F.*2d 365, 368 (2d Cir.1973) ("it would not be unreasonable for a policeman to assume that a man believed to be *one of the top narcotic violators* in the New York area would be carrying arms or would be otherwise violent.") (emphasis supplied), *cert.* denied, 415 *U.S.* 931, 94 *S.Ct.* 1444, 39 *L.Ed.*2d 490 (1974).

Even when officers have reason to believe a suspect is engaged in drug dealing, courts frequently require more to justify a protective search. In *United States v. Trullo,* 809 *F.*2d 108 (1st Cir.) *cert.* denied, —— *U.S.* ——, 107 *S.Ct.* 3191, 96 *L.Ed.*2d 679 (1987), the court upheld a protective search, noting that the officer's suspicions that a narcotics dealer might be armed were justifiably elevated when the officer confronted the suspect in a high-crime area known for drug dealing, and noticed a bulge in the suspect's pocket. *Id.* at 113. *See also United States v. Pajari,* 715 *F.*2d 1378 (8th Cir.1983) (pat-down justified by officers' belief that they were confronting major narcotics dealer who nervously reached for lower leg as officers approached); *People v. Lee,* 194 *Cal.App.*3d 975, 977, 240 *Cal.Rptr.* 32, 36 (1987) (pat-down allowed; "coupled with the officer's knowledge that persons engaged in selling narcotics frequently carry firearms" was fact that suspect "placed his hand inside his jacket" as he turned toward officer); *State v. Ransom,* 169 *N.J.Super.* 511 (App.Div.1979) (search justified because informant's tip concerning narcotics also indicated suspect was armed).

The final component of the *Terry* rule concerns the scope of a protective search. If it has been established that there was a sufficient basis for an officer to make an investigatory stop and then conduct a limited search for weapons, the question to be addressed is whether the search was narrowly confined to the purposes the intrusion is supposed to serve. Since "[t]he sole justification of the search * * * is the protection of the police officer and others nearby * * * it must * * * be confined in scope to an intrusion reasonably designed to discover guns,

knives, clubs, or other hidden instruments for the assault of the police officer." *Terry v. Ohio, supra,* 392 *U.S.* at 29, 88 *S.Ct.* at 1884, 20 *L.Ed.*2d at 911. As Chief Justice Rehnquist has observed, "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams, supra,* 407 *U.S.* at 146, 92 *S.Ct.* at 1923, 32 *L.Ed.*2d at 617.

## III

Applying these principles to the facts of this case, we conclude that although Officer Williams was justified in making an investigatory stop, the record before us does not provide a specific and particularized basis for an *objectively* reasonable suspicion that defendant was armed and dangerous. The information provided the police included a detailed description of the appearance, name, and location of a person allegedly in possession of illegal drugs. It is well established that information provided by an informant can provide the basis for an investigatory stop. *Adams v. Williams, supra,* 407 *U.S.* at 143, 92 *S.Ct.* at 1921, 32 *L.Ed.*2d at 612; *cf. State in Interest of H.B.,* 75 *N.J.* 243 (1977) (holding that corroborated tip relating to armed suspect from anonymous informant can provide basis for stop). The veracity of the tip was corroborated by Officer Williams when he entered the bar. Defendant was the only person matching the description, and Officer Williams also recognized him from a prior arrest for drug possession. Based on the applicable "totality of the circumstances" standard, *United States v. Cortez, supra,* 449 *U.S.* at 411, 101 *S.Ct.* at 692, 66 *L.Ed.*2d at 621; *State v. Davis, supra,* 104 *N.J.* at 490, we conclude that Officer Williams had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez, supra,* 449 *U.S.* at 417, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629.

Officer Williams testified that on entering the bar, he immediately confronted defendant, had him stand away from the bar,

and "proceeded to frisk him." This is not a case, however, where the right to conduct a protective search flowed directly from the basis for the investigatory stop. The tip alleged that defendant was in *possession* of an unidentified illegal drug. Therefore, defendant was not suspected of the violent criminal activity that would justify an "automatic" search. *Terry, supra*, 392 *U.S.* at 33, 88 *S.Ct.* at 1886, 20 *L.Ed.*2d at 913 (Harlan, J., concurring). Further, the information had not indicated that defendant was armed, and Officer Williams testified that he had no recollection of defendant being armed at his prior arrest. There was no evidence of any kind adduced at the suppression hearing suggesting a basis for an objectively reasonable suspicion that defendant was armed.

The Appellate Division accepted Officer Williams' general experience with cocaine dealers as a basis for justifying his assumption that defendant might be armed and dangerous. However, the record in this case contained no evidence that defendant was a cocaine dealer or that Officer Williams had a reasonable basis for believing defendant to be a cocaine dealer. The informant did not describe defendant to be a drug dealer and did not specify the type of drug defendant possessed. Moreover, there was no evidence indicating Williams' prior arrest of defendant was for cocaine possession. Defendant was not a "substantial dealer in narcotics," *United States v. Oates, supra*, 560 *F.*2d 45, and there is no evidence that the Shangri La Bar is located in a "high-crime area known for * * * drug dealing." *United States v. Trullo, supra*, 809 *F.*2d at 109.

We also note that Officer Williams said he frisked defendant for possible weapons or "anything that may be in his possession at that time." That approach is similar to the police conduct disapproved of in *Sibron v. New York, supra*, 392 *U.S.* at 40, 88 *S.Ct.* at 1889, 20 *L.Ed.*2d at 917, which was a companion case to *Terry*. There, the Court critically reviewed testimony of the officer making the search, which "show[ed] that he was looking for narcotics, and he found them." *Id.* at 65, 88 *S.Ct.* at 1904, 20 *L.Ed.* at 936. Such conduct is not sanctioned by the

*Terry* rule, for "[n]othing in *Terry* can be understood to allow * * * any search whatever for anything but weapons." *Ybarra v. Illinois, supra,* 444 *U.S.* at 93–94, 100 *S.Ct.* at 343, 62 *L.Ed.*2d at 247.

The standard for a protective search adopted in *Terry* is whether "a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Obviously, we have no insight into what may have been sensed or perceived by the officers on entering the bar. Our review is restricted to the record at the suppression hearing. We hold only that there was an insufficient basis in this record for the pat-down search of defendant, and that therefore the evidence discovered pursuant to the frisk should have been suppressed. In so holding, we adopt no hard and fast rule that suspicion of illegal drug possession never can form the basis for a protective search of a suspect. We concur with Judge Friendly's warning that "courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake." *United States v. Riggs,* 474 *F.*2d at 699, 705 (2d Cir.1973). However, we conclude that this record does not establish a specific, particularized basis for an objectively reasonable belief that defendant was armed and dangerous.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.